UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ALEXANDER LAWRENCE,

                  Plaintiff,

v.

CITY OF ROCHESTER,                                   Case # 09-CV-6078-FPG
CHIEF DAVID T. MOORE; LT. OGNIBENE,
In his Official and Individual Capacity;                     DECISION & ORDER
OFFICER WILSON, In his Official and Individual
Capacity; & "JOHN DOE," Members of the
Rochester City Police Department,

                  Defendants.

## I.    **INTRODUCTION**

Plaintiff Alexander Lawrence, by his then-attorney Christina A. Agola, Esq.,[1] commenced this action on February 20, 2009, against Defendants City of Rochester ("City"), Chief David T. Moore ("Chief Moore"), Lt. Ognibene ("Ognibene") in his Official and Individual Capacity, Officer Wilson ("Wilson") in his Official and Individual Capacity, and "John Doe," Members of the Rochester City Police Department ("RPD"), alleging deprivation of his constitutional rights  and seeking to recover compensatory and punitive damages for alleged intentional assault and battery, false imprisonment, intentional infliction of emotional distress, negligent infliction of emotional distress, and violations of his civil rights "under the Fourteenth Amendment to the United States Constitution, codified at 42 U.S.C. § 1983, 42 USC § 1985(3), and the United States Constitution, Amendments Five and Fourteen." ECF No. 1. Following completed fact discovery, on March 30, 2012, pursuant to Rule 12(c) of the Federal Rules of

---

[1] On November 21, 2013, Hon. William M. Skretny, Chief Judge of the Western District of New York, granted Ms. Agola's request to withdraw from Plaintiff's case and other pending cases.  On September 29, 2014, Plaintiff notified the Court in writing of a scheduled meeting with a named local attorney, but the Court has not received any communication from an attorney acting on Plaintiff's behalf, or from Plaintiff indicating that he is proceeding other than *pro se*.

Civil Procedure, Defendants moved for judgment on the pleadings ("Motion to Dismiss") (ECF No. 19) and submitted a Memorandum of Law in Support of Defendants' Motion for Judgment on the Pleadings ("Defs.' Mem.") (ECF No. 19-1), and an Affirmation in Support of Defendants' Motion for Judgment on the Pleadings prepared by John M. Campolieto, Esq., of counsel to Robert J. Bergin, Corporation Counsel[2] ("Campolieto Aff.") (ECF No. 19-2), which included attached Exhibits A-E (ECF No. 19-3, 19-4, 19-5, 19-6, 19-7). In response to the motion, on April 25, 2012, Plaintiff filed the Declaration of Christina A. Agola, Esq. ("Agola Decl.") (ECF No. 21), with attached Exhibits A-B (*Id.*), and submitted a Memorandum of Law ("Pl.'s Mem.") (ECF No. 21-1).

As explained more fully below, after conducting a review of the case, I determined that the motion was more properly considered one for summary judgment based on the parties' inclusion of matters outside the pleadings, and notified the parties in writing of the Court's intention in this regard. For the reasons set forth herein below, I grant summary judgment in favor of Defendants.

## II.   **FACTUAL BACKGROUND**

This civil action finds its genesis in an incident occurring at approximately 2 A.M. on October 6, 2007 in the vicinity of Coyote Joe's, a bar located at the corner of East Avenue and Alexander Street in the City of Rochester, New York, whereby, following a disagreement with his girlfriend, Plaintiff had an encounter with members of the Rochester Police Department ("RPD"), and was eventually arrested, handcuffed, and transported to a parking lot across the street from Coyote Joe's before being transported to the Monroe County Jail. ECF No. 1, ¶¶ 16-34. The Complaint alleges that while in Coyote Joe's, Plaintiff and his girlfriend had a disagreement, not involving any screaming, harsh words or physical abuse, causing her to walk

---

[2] The current Corporation Counsel for the City of Rochester is T. Andrew Brown, Esq.

out of the bar. *Id.* ¶¶ 16-18. Plaintiff went out onto the deck of the bar, spoke with his girlfriend, discarded a beverage container into a recycling bin, and then, stepping over the fencing, joined his girlfriend on the street. *Id.* ¶¶ 19-20. The disagreement between Plaintiff and his girlfriend, moments earlier, had dissolved at this point. *Id.* ¶ 20. Upon being approached by three RPD officers who told them it was "time to go," Plaintiff informed the police officers that he was waiting for his friend who was still inside the bar, and walked with his girlfriend to the side of the bar to wait for his friend. *Id.* ¶¶ 21-23. The police officers followed Plaintiff and, moments later, about eight RPD officers "surrounded and aggressively separated" him from his girlfriend. *Id.* ¶ 24. The Complaint alleges that Plaintiff voluntarily put his hands behind his back and informed the officers that he would "not resist" and would "cooperate." *Id.* ¶ 25. According to the Complaint, once Plaintiff and his girlfriend were separated, an officer stood in front of Plaintiff's girlfriend, and the officers smashed Plaintiff's face against the wrought iron fencing; Plaintiff was not resisting, or inciting the officers, but was being cooperative. *Id.* ¶¶ 26-28.

The allegations go on to state that the officers placed Plaintiff in a police car, brought him to a vacant parking lot, dragged him out of the police vehicle, threw him face down on the ground, and several officers beat him. *Id.* ¶¶ 22-32. The Complaint alleges further that Plaintiff was placed back into the police van face first, wedged between the bench and wall, and then removed from the van and taunted by officers who told him they "f…d [his] mother" and "f…d [his] girlfriend." *Id.* ¶¶ 32-33.

The Complaint alleges further that, thereafter, Plaintiff was brought downtown and placed in a single cell, where he was choked by John Doe officer. *Id.* ¶¶ 39-40. Plaintiff's girlfriend's attempts to determine what happened to him, by phone calls and visits to the jail and Hall of Justice, were unsuccessful. *Id.* ¶¶ 35-38. Plaintiff remained in his jail cell where he was choked by a John Doe officer. *Id.* ¶ 39. The Complaint asserts that Plaintiff was continuously

denied phone calls, until about 12:30 P.M. on October 6, 2007, when he was finally permitted to make a call. *Id.* ¶¶ 40-41. Plaintiff remained in the jail cell from approximately 4:00 A.M. until 12:30 P.M. on October 6, 2007, when he was released on bail. *Id.* ¶ 42. According to the Complaint, Plaintiff was charged with disorderly conduct, but all charges were subsequently dismissed on February 27, 2008. *Id.* ¶¶ 43-44.

Based on these factual allegations, the Complaint set forth eight causes of action asserting therein, respectively, intentional assault and battery (First Cause of Action); false imprisonment (Second Cause of Action); intentional infliction of emotional distress (Third Cause of Action); negligent infliction of emotional distress (Fourth Cause of Action); deprivation of civil rights pursuant to 42 USC § 1983 by conduct constituting assault and battery and false imprisonment while acting under the color of State Law (Fifth Cause of Action); intentional, knowing, or reckless indifference by the City in disregarding or failing to investigate prior incidents involving Ognibene, Wilson, and "John Doe" members of the RPD (Sixth Cause of Action); the City's failure to train or supervise the officers and ratification of the officers' conduct (Seventh Cause of Action); deprivation of rights secured by the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983 by the failure to properly train or supervise and/or the failure to adopt proper policies, procedures, or standards, and/or the failure to investigate and the reckless disregard or gross indifference (Eighth Cause of Action). Defendants answered the Complaint (ECF No. 2), denying the factual allegations and setting forth several affirmative defenses, including qualified immunity.

### III.   **PROCEDURAL HISTORY**

Defendants, by their attorney, moved for dismissal of the Complaint on the basis that the Complaint fails to state a claim, and they are entitled to judgment as a matter of law. ECF Nos. 19, 19-1. They sought dismissal of the Complaint on several specified grounds, namely: (1)

there are no factual allegations in the Complaint against Chief Moore; (2) Plaintiff's assault and battery claims against the City must be dismissed, first, because the applicable statute of limitations under General Municipal Law § 50-i(c), one year and 90 days, had run before the Complaint was filed on February 20, 2009 (action accrued on October 6, 2007); and second, because Plaintiff made no claim of false arrest, de-facto conceding the existence of probable cause for his arrest and impliedly conceding the use of some degree of force to effect the arrest; (3) claims against the individual Defendants in their official capacity are actually claims brought against the City (*see Hafeo v. Melo*, 502 U.S. 21, 25 (1991)); (4) there can be no award of punitive damages against the Defendants; (5) Plaintiff has no claim for negligent infliction of emotional distress based upon alleged intentional conduct; (6) Plaintiff has no claim for intentional infliction of emotional distress; (7) Plaintiff's claims brought pursuant to *Monell v. Department of Social Services of City of New York,* 436 U.S. 658 (1978) fail to state a claim against the City; (8) no constitutional violation of Plaintiff's rights has been alleged, and the 1983 claim must fail against all Defendants; and (9) all of the New York State law claims against the City as set forth in the First, Second, Third, and Fourth Causes of Action, brought one year and 134 days after the cause of action accrued on October 6, 2007, must fail because the action was not filed within the one year and 90 days statute of limitations pursuant to General Municipal Law § 50-i(c).  ECF No. 19-1.

Responding to the Defendants' dismissal motion, Plaintiff conceded withdrawal of the following claims: the New York State law claims set forth in the First, Second, Third, and Fourth Causes of Action; all claims against individual Defendants Ognibene and Wilson in their official capacity; any claims against "John Doe" Defendants; any claim for punitive damages against the City.  ECF No. 21.  Specifically, in conceding to withdraw these claims, Plaintiff acknowledged the validity of Defendants' arguments that (1) there are no factual allegations in the Complaint

against Chief Moore, and any allegations against him individually should be dismissed; (2) claims against individual Defendants Ognibene and Wilson in their official capacity must be dismissed; (3) the [City] is not liable for punitive damages; (4) Plaintiff has no claim for negligent and/or intentional infliction of emotional distress; (5) the First, Second, Third, and Fourth Causes of Action should be dismissed because they were not timely filed pursuant to General Municipal Law § 50-i(c); and (6) any claims against John Doe Defendants should be dismissed. Plaintiff, however, did not concede the withdrawal of any claims for punitive damages against Ognibene and Wilson in their individual capacity and argued that the *Monell* claims in the Fifth, Sixth, Seventh, and Eighth Causes of Action were adequately pleaded, satisfying Rule 12(c); he equested a trial on these remaining causes of action. ECF Nos. 21, 21-1.

After duly considering Plaintiff's concessions, requested withdrawals, and acknowledgements, the Court hereby dismisses the First, Second, Third, and Fourth Causes of Action because they were not timely filed pursuant to General Municipal Law § 50-i(c); all claims against individual Defendants Ognibene and Wilson in their official capacity; any claims against "John Doe" Defendants; any claims for punitive damages against the City, *see City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981); any allegations against Chief Moore, individually, for lack of allegations of personal involvement; any claims for negligent infliction of emotional distress; and any claims for intentional infliction of emotional distress. As set forth herein below, the Court proceeds to determine the *Monell* claims articulated in the Fifth, Sixth, Seventh, and Eighth Causes of Action and whether punitive damages against Ognibene and Wilson, in their individual capacities, may be awarded.

## IV.   **DISCUSSION**

### A. **Applicable Legal Standards**

Pursuant to Rule 12(c), "After the pleadings are closed–but early enough not to delay trial–a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Cleveland v. Caplaw Enterprises*, 448 F.3d 518, 521 (2d Cir. 2006) (citing *Karedes v. Ackerely Group, Inc.*, 423 F.3d 107, 113 (2d Cir. 2005); *see also Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001). In adjudicating a motion to dismiss, a court is entitled to consider only the facts alleged in the complaint, any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, any documents integral to the complaint and relied on in it, and facts of which judicial notice may properly be taken under Fed. R. Civ. P. 201. *See In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013); *see Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).

Here, for the Court's consideration in determining the motion, both parties have attached to their respective papers copies of the deposition testimony of Ognibene and Wilson taken on June 24, 2011, more than two years after the filing of the Complaint, and additionally, Defendants have attached the August 3, 2011 deposition testimony of non-party, RPD Investigator Scott Gould ("Gould") who was present during the incident at issue. ECF Nos. 19, 19-1, 19-5, 19-6, 19-7 and ECF Nos. 21, 21-1. Neither party has objected to the other's inclusion of this deposition testimony for consideration.

Rule 12(d) addresses the presentation of matters outside the pleadings and specifies a notice requirement:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the

7

> motion must be treated as one for summary judgment under Rule
> 56, all parties must be given a reasonable opportunity to present all
> the material that is pertinent to the motion.

Fed. R. Civ. P. 12(d); *Sira v. Morton*, 380 F.3d 57 (2d Cir. 2004) ("A district court must convert a motion for judgment on the pleadings to one for summary judgment if the motion includes 'material outside the pleadings' and that material is 'not excluded by the court.'").  The rule requires that the court give "sufficient notice to an opposing party and an opportunity for that party to respond."  *Hernandez v. Coffey*, 582 F.3d 303, 307 (2d Cir. 2009) (quoting *Groden v. Random House, Inc.*, 61 F.3d 1045, 1052 (2d Cir. 1995).  Fundamental to this notice requirement is "the principle that parties are entitled to a reasonable opportunity to present material pertinent to a summary judgment motion."  *Gurary v. Winehouse,* 190 F.3d 37, 43 (2d Cir. 1999).

> Compliance with these requirements . . . is not an end in itself.
> The district court's conversion of a Rule 12(b)(6) motion into one
> for summary judgment is governed by principles of substance
> rather than form.  The essential inquiry is whether the appellant
> should reasonably have recognized the possibility that the motion
> might be converted into one for summary judgment or was taken
> by surprise and deprived of a reasonable opportunity to meet facts
> outside the pleadings.  Resolution of this issue will necessarily
> depend largely on the facts and circumstances of each case.

*Id.* (citing *In re G. & A. Books, Inc.,* 770 F.2d 288, 295 (2d Cir. 1985), *cert. denied,* 475 U.S. 1015 (1986)).

Consequently, by letter dated September 17, 2014, the Court notified *pro se* Plaintiff and the attorney for Defendants, pursuant to Fed. R. Civ. P. 12(d), of its intention regarding the proposed conversion. Plaintiff, in writing, requested and was given additional time, until November 3, 2014, in order to consider and submit a response.  To date, the Court has not received any response from Plaintiff or the Defendants, and the requested date assigned for responding to the Court's notification has now passed.  Defendants' Motion for Judgment on the Pleadings is hereby converted to one for summary judgment.

### B. Summary Judgment Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) ("Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.") (citation omitted). The burden is on the moving party to establish the absence of any material factual issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A court assessing a motion for summary judgment is "required to resolve all ambiguities and draw all permissible inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003); *Duse v. International Business Machines Corp.*, 252 F.3d 151, 158 (2d Cir. 2001) (citing, *e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *see Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135 (2d Cir. 2013). "The inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be reviewed in the light most favorable to the party opposing the motion." *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n*, 182 F.3d 157, 160 (2d Cir. 1999) (quoting *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995)).

Although the district court must view the evidence in favor of the nonmoving party, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Anderson*, 477 U.S. at 252) (internal alterations and emphasis omitted). Reliance by the nonmoving party on "conclusory allegations or unsubstantiated speculation" is insufficient to defeat a motion for summary judgment. *Id.* at 554 (quoting *Fujitsu Ltd. v. Federal Exp. Corp.*, 247 F.3d 423, 428

(2d Cir. 2001)).   Summary judgment is appropriate "[w]here the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).   Thus, the court's function in deciding a summary judgment motion is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

### C.  42 U.S.C. § 1983 Standard

Under 42 U.S.C. § 1983, civil liability is imposed upon any person who, under color of state law, subjects an individual to the deprivation of any rights, privileges, or immunities protected by the Constitution or laws of the United States.   *See* 42 U.S.C. § 1983; *Wimmer v. Suffolk County Police Dept.*, 176 F.3d 125, 137 (2d Cir. 1999).   The statute states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ….

Section 1983, by its terms, is not "a source of substantive rights, but merely provides 'a method for vindication of federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).   Here, Plaintiff has alleged violations of his constitutional rights under the Fourth and Fourteenth Amendments of the United States Constitution.

### D.  Analysis of *Monell* Claims Under 42 U.S.C. § 1983 Against the City of Rochester and Chief Moore

It is well settled that municipalities are not subject to *respondeat superior* or vicarious liability under § 1983 for the actions of their employees.   *Monell v. New York City Dept. of*

*Social Servs.,* 436 U.S. 658, 691 (1978). To maintain a successful § 1983 action against a municipality or municipal employee sued in his or her official capacity, a plaintiff is required to establish: (1) the actions were taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages and (5) that an official policy of the municipality caused the constitutional injury. *Id.* at 694.

"Official-capacity suits, [], 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (quoting *Monell*, 436 U.S. at 690 n.55); *see Reynolds v. Giuliani*, 506 F.3d 183, 191 (2d Cir. 2007) ("An official capacity suit against a public servant is treated as one against the governmental entity itself."). Here, Plaintiff relies on the respective descriptions set forth in the Complaint of Defendants Chief Moore and the City as parties to this action, stating that at all times therein mentioned, Defendant Chief Moore "maintained and was responsible for overseeing, supervising, and regulating all conduct engaged in and undertaken by" Defendants Ognibene and Wilson (ECF No. 1, ¶ 12); and Defendant City "maintained and was responsible for overseeing, supervising, and regulating" all conduct engaged in by the City's RPD personnel, including that of Defendants Chief Moore, Ognibene, and Wilson (*Id.* ¶ 15). Assuming, and to the extent that he has been sued in his official capacity, the action against Chief Moore is against the City who is the real party in interest.

Generally, to establish the existence of an official policy of the municipality which caused the constitutional injury at issue, a plaintiff is required to prove (1) the existence of a formal policy officially promulgated or adopted by the municipality, *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986); (2) actions or decisions by an official with final policymaking authority which caused the alleged violations of constitutional rights, *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 129-30 (1988); (3) the existence of a custom or practice so

permanent, persistent, and widespread on the part of subordinate officials such that it constitutes a custom or usage so as to imply the constructive acquiescence of policymaking officials, *see id.* at 130; or (4) the failure of policymaking officials to properly train or supervise their subordinates, amounting to a deliberate indifference to the rights of those encountering municipal employees, *see City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989); *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011) ("To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact'") (citing *City of Canton v. Harris*, 489 U.S. at 388).

Importantly, municipal policy must be the "moving force of the constitutional violation." *Polk County v. Dodson*, 454 U.S. 312, 326 (1981) ("[O]fficial policy must be the 'moving force of the constitutional violation' in order to establish the liability of a government body under § 1983.") (citing *Monell*, 436 U.S. at 694). Accordingly, Plaintiff needed to sufficiently establish a direct causal link between a municipal policy or custom and the alleged constitutional violation. *Id.*

"'Municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives' by city policymakers." *City of Canton v. Harris*, 489 U.S. at 389 (quoting *Pembaur v. Cincinnati*, 475 U.S. at 483-84). *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011). Thus, to constitute deliberate indifference in the context of failure to train or supervise, a plaintiff must demonstrate that (1) municipal policymakers must know "to a moral certainty" that municipal employees will confront a given situation; (2) either the situation must present employees with a difficult choice of the sort that training or supervision will make less difficult or there is "a history of employees mishandling the situation"; (3) the wrong choice by the city employee will frequently cause the deprivation of

a citizen's rights." *Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir. 1992). A Plaintiff must also "identify a specific deficiency in the city's training program and establish that that deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation." *Wray v. City of New York*, 490 F.3d 189, 196 (2d Cir. 2007) (quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir. 2004) (quoting *City of Canton*, 489 U.S. at 391)); *Green v. City of New York*, 465 F.3d 65, 81 (2d Cir. 2006). Deliberate indifference may be inferred from the failure to train or supervise based on proof of repeated complaints of civil rights violations that "are followed by no meaningful attempt on the part of the municipality to investigate or to forestall." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995).

To be sure, "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Schweitzer v. Crofton* 560 F. App'x 6 (2d Cir. March 13, 2014) (quoting *Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir. 2006)).

Here, alleging a violation of his constitutional rights, Plaintiff has framed his claims so as to assert municipal liability in several different ways. In the Fifth Cause of Action,[3] Plaintiff has alleged that as RPD police officers acting under the color of state law, Defendants Ognibene and Wilson, in their individual capacity, deprived him of his civil rights under 42 U.S.C. § 1983 by assaulting and battering and falsely imprisoning him, presumably, rights protected under the Fourth[4] and Fifth[5] Amendments of the United States Constitution. ECF No. 1, ¶¶ 68-73.

---

[3] Both Plaintiff and Defendant characterized this cause of action as a *Monell* claim.

[4] The Fourth Amendment provides as follows:

   "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause,

The Sixth Cause of Action alleges the City had actual or constructive notice of the propensity of Defendants Ognibene and Wilson to abuse and misuse the power and authority as police officers based on other incidents and intentionally, knowingly and/or with reckless indifference disregarded or failed to investigate the prior incidents, or alternatively, recklessly, with gross indifference, and callous disregard, investigated the incidents, but failed to remedy the situation; as a result of this reckless indifference and gross negligence in disregarding or failing to properly investigate the prior incidents, the City allowed Defendants Ognibene and Wilson to assault and batter, falsely imprison, and deprive him of his civil rights; intentionally, knowingly, or with deliberate indifference failed to properly train or supervise their police officers; and allowed Defendants Ognibene and Wilson to engage in the improper gross conduct complained of. *Id.* ¶¶ 74-79.

The Seventh Cause of Action alleges that the City permitted Ognibene and Wilson to continue their employment as police officers subsequent to having been placed on actual or constructive notice of numerous similar prior incidents and ratified their misuse and abuse of power as police officers employed by the City. *Id.* ¶¶ 80-82.

The Eighth Cause of Action alleges that the City knew or should have known that the failure to train or supervise and/or the failure to adopt proper policies, procedures, or standards,

---

supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

U.S. Const. amend. IV.

[5] The Fourteenth Amendment provides:

"All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.  No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

U.S. CONST. amend. XIV.

and/or the failure to properly investigate, and the reckless disregard or gross indifference would result in the deprivation of rights secured by the Fourth and Fourteenth Amendments to the United States Constitution and by 42 U.S.C. § 1983; as a result of the City's failure to take remedial action concerning Ognibene and Wilson's prior abuses of police authority and the failure to properly investigate the prior similar incidents and/or the City's reckless disregard or gross indifference, the City had a policy, practice, or custom which encouraged or permitted its deputies to engage in such gross misconduct; the City intentionally, knowingly, maliciously and/or recklessly permitted the continuation of such policy, practice, or custom; upon information and belief, as a direct and proximate result of the policies, practice, or custom, the City intentionally, deliberately, or with gross reckless indifference, deprived him of his constitutional and civil rights. *Id.* ¶¶ 83-89.

Read together, these claims against the City distill to: actual or constructive knowledge on the part of the City of prior bad acts by Ognibene and Wilson which the City failed to investigate or disregarded, or investigated but did not remedy or terminate Ognibene and Wilson for engaging in these prior bad acts, as a result allowed them to violate his civil rights; the City's ratification of the prior bad acts by failing to remedy them; the City's failure to train and supervise these officers; the City's failure to take remedial action concerning prior abuses of police authority and the failure to properly investigate the prior similar incidents and/or the City's reckless disregard or gross indifference, constituted such policy, practice or custom which encouraged or permitted its deputies to engage in such gross misconduct; the City intentionally, knowingly, maliciously, and/or recklessly permitted the continuation of such policy, practice or custom.

In this case, *Monell* liability does not obtain for several reasons. First, the prior incidents or prior bad acts involving Ognibene or Wilson alleged in the Complaint are <u>unspecified</u>, and

evidence relative to the existence of any prior incidents or bad conduct on the part of either officer is lacking.  Unspecified prior conduct, in this circumstance, permits no inference that the City, with notice or knowledge of such, intentionally, knowingly, and/or with reckless indifference disregarded or failed to investigate, or investigated but failed to remedy any situations related to complaints so as to allow Defendants Ognibene and Wilson to assault and batter, falsely imprison him, and deprive him of his civil rights, or that the City had a policy, practice, or custom of failing to investigate, which encouraged the complained of constitutional violation.  Nor is there evidence of ratification in this regard. Likewise, there is no evidence suggesting that policymakers constructively acquiesced in the continuation of any policy which allowed these constitutional violations as a result.

Significantly, regarding the failure to train or supervise, absent in this case is any deliberate indifference evidenced by repeated complaints of constitutional violations which the City, by deliberate choice, failed to investigate, or forestall further incidents.  While in their roles as RPD police officers, Ognibene and Wilson, to a "moral certainty" would have confronted situations in which they encountered and arrested citizens every day for violations of the law, there is no evidence that they had a history of mishandling these situations.  Nor is there any evidence that they made wrong choices which frequently violated citizen's constitutional rights, *see Walker v. City of New York*, 974 F.2d at 297, such that the City's failure to train them amounted "a decision by the city itself to violate the Constitution." *Connick v. Thompson,* 131 S.Ct. at 1360.  Nor has there been identified any specific deficiency in any training and supervision that is closely related to the ultimate injury, such that this deficiency actually caused the constitutional violation.

At the summary judgment stage, much more is required than bare or conclusory allegations in the Complaint.  Upon a careful review of, and favorably reading, the deposition

testimony, one is struck by the glaring absence of any evidence regarding a deliberate or conscious choice on the part of the City to inadequately train, or its failure to supervise, Defendants Ognibene and Wilson, most particularly, in the conduct of their contact with citizens, or that their training was deficient in some specified manner. Indeed, Wilson testified to having received training at the police academy about the use of force on citizens during arrest procedures, stating that RPD written policies and procedures provide that "you apply the right amount of force as used or necessary to effect the arrest," Wilson Dep. 65:8-66:5; and Ognibene generally testified to having received police academy training, actual road/field training, as well as, training on administrative policies within the department (Ognibene Dep. 12:19-13:24). No evidence emerged from their testimony regarding any deficiencies in such training, let alone that any deficiencies were the result of the City's deliberate indifference. Without notice that training was deficient, the City can hardly be said to have "deliberately chosen a training program that will cause violations of constitutional rights." *Connick v. Thompson*, 131 S.Ct. at 1361.

Finally, it is well established that proof of a single incident of unconstitutional activity by a police officer cannot suffice to establish municipal liability. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker"). Such is not the case here.

Unfortunately, even drawing all inferences and resolving any ambiguities in Plaintiff's favor, this action is not salvageable since there is no evidence to support these *Monell* claims. They cannot survive summary judgment.

### E.  Individual Claims Against Ognibene and Wilson Under § 1983

To establish personal liability in a § 1983 action, it suffices "to show that the official, acting under color of state law, caused the deprivation of a federal right." *Kentucky v. Graham*, 473 U.S. at 166.  Generally, defendants may only be held liable for damages under § 1983 when they have personal involvement in the alleged constitutional deprivation. *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986).  Plaintiff, in the Fifth Cause of Action, alleged that acting under the color of state law, Defendants Ognibene and Wilson, in their individual capacity, deprived him of his civil rights by assaulting and battering and falsely imprisoning him in violation of the Fourth and Fourteenth Amendments.

As defined under New York law, "A civil assault 'is an intentional placing of another person in fear of imminent harmful or offensive contact'; civil battery 'is an intentional physical wrongful contact with another person without consent.'" *Charkhy v. Altman*, 252 A.D.2d 413, 414 (1st Dep't 1998) (quoting *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.*, 994 F.2d 105, 108 (2d Cir. 1993)).  As stated earlier, the state claim alleging civil assault and battery was dismissed.

"As in the case of false arrest, [a district court] look[s] to state law principles to determine the validity of a plaintiff's federal civil rights claim based on false imprisonment." *Rutigliano v. City of New York*, 326 F. App'x 5, (2d Cir. 2009) (quoting *Russo v. City of Bridgeport*, 479 F.3d 196, 204 (2d Cir. 2007)).  "In New York, the tort of false arrest is synonymous with that of false imprisonment," and requires a plaintiff to show that: (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Posr v. Doherty*, 944 F. 2d 91, 96 (2d Cir. 1991) (quoting *Broughton v. State*, 37 N.Y.2d 451, *cert denied* 423 U.S. 929 (1975)); *see Martinez v. City of Schenectady*, 97 N.Y.2d 78, 85 (2001)).

Defendants contend that the Complaint should be dismissed against Ognibene and Wilson because it "is devoid of any allegations of any personal involvement nor does it allege they were directly and personally responsible for the purported unlawful conduct." ECF No. 19-1. Defendants argue that they are entitled to "absolute immunity"[6] on this basis, but have reserved their right to assert their qualified immunity defense at the time of trial. *Id.* Plaintiff, relying on the deposition testimony of Ognibene and Wilson, states without elaboration of facts, that Ognibene and Wilson "both admitted their personal involvement during their depositions." ECF No. 10 at 10.

Leaving aside for a moment the factual allegations of the Complaint which do not specifically name or identify the police officers alleged to have violated Plaintiff's civil rights, the only supportive evidence Plaintiff has offered to substantiate his version of the events occurring on October 6, 2007 is the deposition testimony of Defendants Ognibene and Wilson. Before turning to review their deposition testimony, a brief look at the deposition testimony of Gould, a nonparty, proves helpful, as it sheds light on the circumstances surrounding Plaintiff's arrest and the ensuing events leading up to Plaintiff's transport downtown.

Gould testified that he was working bar detail in the East Avenue and Alexander Street area when, at 2 A.M. on October 6, 2007 on the sidewalk outside the fence of Coyote Joe's nightclub on East Avenue, he first observed a crowd of people and Plaintiff who was being separated from his girlfriend by private security guards because they were arguing; Plaintiff was agitated, angry, directing vulgar comments towards them, and in a very defiant body posture towards them—rigid, chest forward, head forward, arms held back like just before cocking them to strike someone. Gould Dep. 25:21-36:8. Observing that Plaintiff wasn't leaving like they were asking him to, Gould, in police uniform, intervened and told Plaintiff that was enough, he

---

[6] The Defendants offered no support for this argument nor does the Court see a basis for entitlement to absolute immunity.

needed to stop, and it was time to leave; Plaintiff continued to be agitated, staring, yelling, and confrontational with the security guards and did not respond to Gould, but did turn, took a step or two, and then turned around again and continued the same actions of being defiant, arguing, yelling and swearing at the security guards. *Id.* 36:10-40:17.

Thrice more, Gould repeated his requests to Plaintiff to leave, but each time Plaintiff turned, took a couple of steps, then turned around with an aggressive posture, yelling, and challenging the guards; he was not walking away. *Id.* 40:18-44:15. Determining that verbalizing commands to Plaintiff was not working, Gould, facing Plaintiff, told Plaintiff it wasn't worth going to jail and he needed to leave, then, put his hand on Plaintiff's arm and turned him around and gave him a slight push down towards Alexander Street, verbally and physically prompting him to leave the area. *Id.* 44:17-45:12. Plaintiff flung his right arm upwards to knock Gould's hand away, turned and directed all of his aggression at Gould — defiant look, aggressive posture, shoulders back, head and chest forward, arms at his side with his hands flexed and tense, like a boxer, preparing to defend himself or attack—and said, "Don't put your fuckin hands on me." *Id.* 46:5-47:8. Based on Plaintiff's actions, level of intoxication, i.e., odor of alcoholic beverage emanating from his breath, being slightly disheveled, with watery, glassy, somewhat red eyes, physical and emotional demeanor, and refusing commands, Gould made the decision to and did place Plaintiff under arrest for disorderly conduct for his temerarious activities and refusing to disperse; Gould told Plaintiff he was under arrest. *Id.* 47:12-48:14. Plaintiff complied with the request to put his hands behind his back for handcuffing, and Gould radioed for a car with a cage to secure him. *Id.* 48:14-51:9.

As Gould stood holding him in the escort position, Plaintiff, again, became aggressive toward the security guards and tried lunging forward towards them; Gould maintained control by using just enough force to overcome these aggressive actions, using Plaintiff's momentum to

turn him around and place his chest up against the brick wall. *Id.* 51:7-52:15. While still in the escort position and with Gould applying wrist compression to his right wrist, Plaintiff continued being aggressive, trying to get at the security guards, and trying to slide along the wall southbound towards East Avenue to get past him to get to the two security guards who could still be seen. *Id.* 52:17-53:20. Gould kept Plaintiff up against the wall, but sought to remove the focal point of his aggression, placed his right hand against the right side of Plaintiff's face and turned his head northbound so that he wouldn't be looking at the security guards; Plaintiff's face never came in contact with the brick wall. *Id.* 54:7-55:23.

Once Ognibene arrived with the car, Gould took Plaintiff over and sat him inside, but Plaintiff refused to allow the door to be shut by jamming his foot between the door and the door frame. *Id.* 56:10-57:23. To alleviate this situation, Gould grabbed his feet, pulled them from the frame, and put them in the car, but couldn't shut the door because Plaintiff jammed his feet into the door frame, and did so several more times as Gould tried to shut the door. *Id.* 57:6-59:19. Ognibene went around to the driver's side, and through there, grabbed Plaintiff around the shoulder area and pulled him deeper into the car; once Plaintiff's feet cleared from the door jamb, the doors were closed and they relocated to the parking lot at 384 East Avenue, the Genesee Valley Club. *Id.* 59:22-60:15. Once in the parking lot, Plaintiff asked Gould to check his handcuffs and exited the car under his own power for this purpose, and got back in once the check was completed. *Id.* 64:13-66:11.

However, Plaintiff refused to exit the vehicle when asked to do so for photographs. Ognibene grabbed Plaintiff's shoulder area and tried pulling him out to take the photograph, but Plaintiff, again, wedged his foot between the door and the door frame, preventing that. *Id.* 66:14-68:7. As Ognibene pulled him, Plaintiff lunged backwards, flung his body, breaking Ognibene's grasp, and hit his head on the top of the car door frame, before landing back into the

car. *Id.* 68:8-69:21.  At that point, Ognibene was able to pull Plaintiff out of the car and guide him to the ground, as Plaintiff was limp and wouldn't stand up. *Id.* 69:23-70:4.  Gould observed that Plaintiff, as he lay on the ground, looked around, and rolled over onto his side, appearing to be getting ready to kick or strike out at somebody; Ognibene, Wilson, and he were the closest to Plaintiff. *Id.* 70:14-72:3.

Believing this, based upon his training and experience as a police officer and previous defensive tactics instructor, Gould grabbed Plaintiff's legs before he kicked, pulled on them, rolled him onto his stomach, and controlled Plaintiff's legs by initiating a two-point landing whereby he placed his legs across the back of Plaintiff's legs. *Id.* 73:21-74:13.  Ognibene used a three-point landing to control Plaintiff's upper body from the side, by placing his right leg against Plaintiff's left arm and his left leg shin at a 45-degree angle across Plaintiff's back, from the shoulder to the right hip, but not directly on the spine. *Id.* 74:15-75:10.  Plaintiff yelled, "they're beating me," as if attempting to draw a crowd. *Id.* 75:24-76:3.  Once they felt safe and Plaintiff had calmed down, Gould and Ognibene got off Plaintiff, lifted him up, and Gould took Plaintiff's photograph before he was placed in the wagon. *Id.* 76:3-76:6.  Gould observed no injuries on Plaintiff's arms or hands, but did see discoloration under one of his eyes, which from other booking folders, appeared to be something natural. *Id.* 78:2-79:2.  Gould observed Plaintiff being placed in the wagon for transport to booking, but did not assist in doing so. *Id.* 80:15-83:12.  He later saw Plaintiff in booking; he appeared to be in the same condition as he had earlier at 348 Alexander Street. *Id.* 83:18-84:24.

Wilson testified that when he and Officer Ognibene arrived in their patrol car at Coyote Joe's near the corner of East and Alexander on the date of the incident, Plaintiff was standing next to Inv. Gould, already handcuffed and in custody.  Wilson Dep. 28:14-32.  Wilson testified he did not have any physical contact with Plaintiff either at that location, or in the parking lot at

East Avenue and Alexander to which he and Ognibene drove Plaintiff to await the paddy wagon for transport to booking at the Monroe County Jail. *Id.* 39:22-41:15, 43:19-44:4. Nor did he at any time engage in conversation with Plaintiff. *Id.* 40:2-40:5, 59:9-59:25. He did not prepare a written narrative relative to the event, or do any paperwork concerning the arrest. *Id.* 32:11-32:14, 47:21-48:2. Wilson stated that he spent most of the time in the parking lot at East Avenue and Alexander in the patrol car. *Id.* 61:18-63:7. Wilson did not assist in placing Plaintiff in the paddy wagon; afterwards, he and Ognibene left. *Id.* 62:11-63:13.

Ognibene testified that when he and Wilson arrived shortly after 2:00 A.M. in their patrol car, at Coyote Joe's near the corner of East and Alexander, he observed Inv. Gould standing outside with a gentleman in handcuffs; Inv. Gould had made an arrest. Ognibene Dep. 24:12-30:19, 43:18-23. The person was loud and belligerent, swearing and thrashing about, wouldn't adhere to any police commands, and was clearly intoxicated. *Id.* at 31:11-17. Plaintiff would not adhere to their verbal commands to get into their patrol car, and once sitting down inside, would not go into the vehicle completely — he would not put his feet in, despite being told numerous times to do so. *Id.* 32:23-36:14. Ognibene needed to close the door and get out of there because there were a lot of people around and he was concerned for his safety and that of Plaintiff, so he went to the driver's side passenger door, opened the door, went in, and guided him by the shoulders into the car; he did not grab Plaintiff by the hands as he was in handcuffs. *Id.* 36:17-37:5.

Next, Ognibene and Wilson drove Plaintiff to a private, open parking lot at 384 East Avenue, the East Avenue Inn, maybe 50 yards away, for safety reasons and to avert the bar closing crowd. *Id.* 38:7-42:7. Upon arriving in the parking lot, Plaintiff continued screaming vulgarities and refused to adhere to commands to exit the patrol car to be photographed. Ognibene went in to try to get him out, first by trying to move his legs from the door jamb and

get his feet out, but that didn't work, and then by trying to grab his shoulders underneath his arms because Plaintiff was in handcuffs and he did not want to grab him by the arms and dislocate his shoulder, or injure him. *Id.* 47:17-54:9. Plaintiff broke Ognibene's grip and, due to the pressure he was exerting, launched himself across the back seat hitting his head on the closed back door. *Id.* 50:2-51:20. Ognibene went around to the passenger side where Plaintiff now was, opened the door, grabbed his shoulders and pulled him out of the car onto the ground; Plaintiff's butt or lower back made contact with the ground, but his head did not hit the ground. *Id.* 52:3-54:21, 58:9-18. Wilson did not participate in removing Plaintiff from the car. *Id.* 52:13-20.

Plaintiff tried to duck having his picture taken and was trying to kick. *Id.* 55:10-13. While on the ground, Plaintiff was turning, kicking, and flailing, so Ognibene and Gould rolled him back over onto his stomach and, using a three-point landing technique for ground stabilization, Ognibene placed his shin across Plaintiff's shoulder blades. *Id.* 59:8-60:12, 65:12-68:15. In a short time, Plaintiff calmed down a little, and Ognibene removed his shin. *Id.* 61:2-62:3. His recollection refreshed by his written report, Ognibene said he and Gould lifted Plaintiff to his feet, and Gould took photos. *Id.* 67:16-68:3. Ognibene did not recall if he helped place Plaintiff in the transport van and did not recall Plaintiff being removed from the van after being placed in there for transport to booking. *Id.* 68:20-70:8. He did not witness any RPD member strike Plaintiff or witness Plaintiff strike his head on the ground; and did not recall whether he observed that Plaintiff's clothes were ripped or torn. *Id.* 76:10-15, 80:6-25. Ognibene had no further contact with Plaintiff once he was in the paddy wagon. *Id.* 81:2-6.

### 1. Probable Cause

As the parties agree, Plaintiff was arrested for disorderly conduct. New York Penal Law § 240.20 (McKinney 2014) provides that:

> A person is guilty of disorderly conduct when, with intent to cause
> public inconvenience, annoyance or alarm, or recklessly creating a
> risk thereof: 1. He engages in fighting or in violent, tumultuous or
> threatening behavior; or 2. He makes unreasonable noise; or 3. In a
> public place, he uses abusive or obscene language, or makes an
> obscene gesture; or 4. Without lawful authority, he disturbs any
> lawful assembly or meeting of persons; or 5. He obstructs
> vehicular or pedestrian traffic; or 6. He congregates with other
> persons in a public place and refuses to comply with a lawful order
> of the police to disperse; or 7. He creates a hazardous or physically
> offensive condition by any act which serves no legitimate purpose.

For purposes of Fourth Amendment requirements, the right to be free from arrest absent probable cause is well established. Probable cause means "knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014) (quoting *Williams v. Town of Greenburgh*, 535 F.3d 71, 79 (2d Cir. 2008) (internal quotation marks and alterations omitted)).

Under the totality-of-the-circumstances analysis, probable cause is a "fluid" concept which does not demand "harsh certainties" but deals with probabilities—"factual and practical considerations of everyday life on which reasonable and prudent men, not technicians, act." *Illinois v. Gates*, 462 U.S. 213, 231-32 (1983). The determination regarding whether probable cause exists requires that courts "must consider those facts available to the police officer at the time of the arrest and immediately before it." *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002); *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007) (assessing probable cause based on "the facts known to the arresting officer at the time of the arrest," not thereafter).

Here, at the time he told Plaintiff he was under arrest and took him into custody, Gould, based upon his personal observations, was possessed of knowledge of, and reasonably trustworthy information regarding, facts and circumstances that were sufficient to warrant a

person of reasonable caution in the belief that an offense had been or was being committed.  I,
therefore, find that probable cause existed to support Plaintiff's arrest.

Where an arrest is supported by probable cause, an officer will not be liable under
theories of assault and battery for the "use [of] physical force when and to the extent she or he
reasonably believes [it is] necessary to effect the arrest."  *Lederman v. Adams*, 45 F. Supp. 2d
259, 268 (S.D.N.Y. 1999) (quoting New York Penal Law § 35.30 (when effecting an arrest of a
person whom he or she reasonably believes to have committed an offense, a police officer "may
use physical force when and to the extent he or she reasonably believes such to be necessary to
effect the arrest."); *Cunningham v. United States*, 472 F. Supp. 2d 366, 383 (E.D.N.Y. 2007);
*Wyllie v. District Attorney of County of Kings*, 2 A.D. 3d 714, 718-19 (2d Dep't 2003).

Probable cause is a complete defense to a constitutional claim of false arrest, as well as a
claim of false imprisonment.  *Betts v. Shearman*, 751 F.3d at 82 (citing *Singer v. Fulton Cnty.
Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995); *Zanghi v. Inc. Vill. of Old Brookville*, 752 F.2d 42, 45
(2d Cir. 1985)).  "A 1983 claim for false arrest, resting on the Fourth Amendment right of an
individual to be free from unreasonable seizures, including arrest without probable cause, is
substantially the same as a claim for false arrest under New York Law."  *Weyant v. Okst*, 101
F.3d 845, 852 (2d Cir. 1996) (citations omitted).  The existence of probable cause "is a complete
defense to an action for false arrest" brought under New York Law or § 1983.  *Id.* 852.

### 2.  Wilson

Viewing the deposition testimony of Gould, Ognibene, and Wilson in the light most
favorable to Plaintiff, it cannot be said that Wilson was personally involved or directly
participated in Plaintiff's actual arrest which was effected by nonparty Gould and took place
before Wilson and Ognibene arrived on East and Alexander outside Coyote Joe's.  Wilson's only
involvement on October 6, 2007 was driving a police vehicle with Ognibene following Plaintiff's

arrest.  There was no testimony that he smashed Plaintiff's face into the wrought iron fencing outside Coyote Joe's or that he was even present when it occurred.  Nor did he have any physical contact with Plaintiff either on East and Alexander in the vicinity of Coyote Joe's or in the parking lot at 384 East Avenue.  Essentially, there is no evidence on which the jury could reasonably find for Plaintiff against Wilson.

### 3.  Ognibene

Again, viewing the deposition testimony of Gould, Ognibene, and Wilson in the light most favorable to Plaintiff, it cannot be said that Ognibene was personally involved or directly participated in the arrest effected by Gould.  Plaintiff's arrest for disorderly conduct took place before Ognibene and Wilson arrived.

The Complaint alleged no facts constituting any unconstitutional conduct on the part of Ognibene as he placed Plaintiff into the patrol car on Alexander Street near Coyote Joe's, and Ognibene described none in his deposition.  However, the Complaint alleged other occurrences of unconstitutional police conduct which he claims took place in the period after his arrest, or during post-arrest.  Specifically, he alleged that in the vacant parking lot police officers proceeded to drag him out of the car; he was thrown face first onto the ground, and beaten by several police officers; and he was put into the police van face first and wedged between the bench and the wall of the van.  ECF No. 1, ¶¶ 30-33.  Ognibene testified that when Plaintiff refused to exit the vehicle to be photographed, he grabbed Plaintiff's shoulders and pulled him out of the police car onto the ground in the parking lot at 384 East Avenue.  The Complaint made no mention that Plaintiff hit his head on the door frame during lunging activity as Ognibene tried to pull him out of the vehicle.  Ognibene further testified to performing a three-point ground stabilization technique on Plaintiff as he kicked at the officers.  He did not recollect assisting Plaintiff into the transport van.

In *Graham v. Connor*, 490 U.S. 386, 395 (1989), the Supreme Court ruled that "*all* claims that law enforcement officers have used excessive force—deadly or not— in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Moreover, "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, not 20/20 hindsight"; the proper inquiry in this regard is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. "The 'nature and quality of the intrusion on the individual's Fourth Amendment interests' must be carefully balanced 'against the countervailing governmental interests at stake.'" *Id.* at 396. Thus, when applying the test of reasonableness, a court should carefully consider the facts and circumstances of each case, including the severity of the crime, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Id.* at 397 (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).

The *Graham* Court, however, declined to resolve the question "whether the Fourth Amendment continues to provide protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins." *Id.* n.10. The Second Circuit has taken the approach that *Graham*'s Fourth Amendment analysis should apply to claims arising *after* arrest, as well. *Powell v. Gardner*, 891 F.2d. 1039, 1044 (2d Cir. 1989) ("We think the Fourth Amendment standard probably should be applied at least to the period prior to the time when the person arrested is arraigned or formally charged, and remains in the custody (sole or joint) of the arresting officer.").

Allowing Plaintiff's claim the benefit of the Fourth Amendment's objective reasonableness analysis, its faint approximation to excessive force notwithstanding, I find that

Ognibene's post-arrest involvement with Plaintiff occurred in connection with moving Plaintiff out of the police car for the purpose of obtaining photographs in order to comply with standard police procedures and using self-defense techniques to prevent Plaintiff from kicking police officers once he was outside the vehicle.  On balance, this conduct was both reasonable and no more than necessary in light of the circumstances.  As such, it did not unduly or severely intrude on Plaintiff's Fourth Amendment interests.

That Ognibene did not recollect assisting with placing Plaintiff in the paddy wagon does not alter this view.  While the Complaint described Plaintiff's cooperation near Coyote Joe's, it is silent regarding any alleged cooperation by Plaintiff in the parking lot at 384 East Avenue.  The deposition testimony painted a vivid picture of Plaintiff as intoxicated, uncooperative, refusing to obey police instructions to exit the police car to be photographed, obstructing  efforts to remove him from the police car, and posing a safety hazard to these officers by kicking, requiring the use of certain stabilization procedures to physically restrain and calm him.  There is no factual dispute regarding Plaintiff being dragged out of the police vehicle, and the conclusory allegations of the Complaint merely state that Plaintiff was "beaten by several police officers." The manner in which the alleged beating occurred, the extent of any alleged resulting injuries, and by whose hands, were omitted.  Though relied on by Plaintiff, the deposition testimony of Ognibene and Wilson failed to fill these critical evidentiary gaps.  Summary judgment in favor of Ognibene, as well, is warranted.

Resolving all ambiguities and drawing all possible inferences in favor of Plaintiff and viewing this deposition testimony in the light most favorable to Plaintiff, I find that no genuine dispute as to any material fact exists respecting this cause of action and Defendants Ognibene and Wilson are entitled to judgment as a matter of law.  For these reasons, an order granting summary judgment in their favor is appropriate regarding this claim.

**F.  CONCLUSION**

The Court hereby GRANTS summary judgment in favor of Defendants on the ground that no genuine dispute as to any material facts exists and they are entitled to judgment as a matter of law.  The Complaint filed in Case No. 09-CV-6078 is hereby dismissed.  The Clerk of the Court is instructed to dismiss the action and close this case in accordance with the determinations herein.

IT IS SO ORDERED.

Dated: February 6, 2015
         Rochester, New York

HON. FRANK P. GERACI, JR.
United States District Judge